**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| **JOSE MANUEL FUENTES,** | § | |
| **TDCJ No. 02126189,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **V.** | § | **W-20-CV-1094-ADA** |
| | § | |
| **BOBBY LUMPKIN, Director,** | § | |
| **Texas Department of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| | § | |
| **Respondent.** | § | |

## <u>ORDER</u>

Before the Court are Petitioner Jose Manuel Fuentes's pro se Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (ECF No. 1) and Respondent Bobby Lumpkin's Amended Answer (ECF No. 14). Having reviewed the record and pleadings submitted by both parties, the Court concludes Petitioner's federal habeas corpus petition should be denied under the standards prescribed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *See* 28 U.S.C. § 2254(d).

## <u>I. Background</u>

In June 2015, Petitioner was charged by indictment with two counts of aggravated sexual assault of a child and one count of indecency with a child by exposure. (ECF No. 11-16 at 45-46.) On January 26, 2017, a jury convicted Petitioner of all three counts; he was sentenced to life imprisonment for the aggravated sexual assault of a child counts and ten years imprisonment for the indecency with a child by exposure count. The judge set the ten-year sentence and one life imprisonment sentence to run consecutively with

the other life imprisonment sentence. *State v. Fuentes*, No. 2015-1343-C2 (54th Dist. Ct., McLennan Cnty., Tex. Jan. 26, 2017). (ECF Nos. 11-15 at 51-52; 11-16 at 1-4.) The following is a summary of the factual allegations against Petitioner.

> At the time of trial, G.G. [the complainant] was fifteen years old. The charges against appellant stemmed from events G.G. said occurred when she was five and six years old.
>
> G.G.'s mother began living with appellant in 2001, when G.G. was two or three months old. They later married. G.G. has two brothers, one older and one younger. The younger brother is the child of G.G.'s mother and appellant.
>
> Reginald Lewis, a CPS investigator, testified at trial that in 2007, he responded to a referral regarding G.G. Lewis spoke with school personnel who expressed concern over G.G.'s absence from school. G.G.'s brother told Lewis G.G. was at home and was very ill. When Lewis visited the home, he spoke with G.G. and her mother. He saw a mark on G.G.'s forehead. G.G. told Lewis the mark was caused by a "whopping" by appellant. When Lewis investigated further, appellant told Lewis he was frustrated because he saw G.G. put her hands down her brother's pants while he was driving the children home. He said he spanked G.G. because he did not believe she took his concerns seriously. Lewis told the jury G.G. did not make an outcry despite his questions to her about possible sexual abuse. He also noted G.G. was not hesitant to speak with him during the investigation.
>
> The children were removed from the home in 2007 and sent to live with their maternal grandmother in Fort Worth. In 2009, appellant pled guilty to injury of G.G. He was imprisoned as a result of that plea. The mother visited appellant twice and she and the children spoke with appellant on the phone. The mother eventually went to live with her mother and the children in Fort Worth. When released from prison, appellant was permitted supervised visits with the children.
>
> Several other witnesses testified to their interactions with G.G. and the other children. Among those witnesses were a police officer, a CPS investigators supervisor, two conservatorship workers, and G.G.'s attorney ad litem. All of them testified that G.G. never made an outcry of sexual abuse to them.
>
> The mother and appellant divorced in 2010. The mother married a man who had a daughter, A.H., nine months younger than G.G. The two shared a

room. A.H. testified that one day while the girls were sitting on the floor using their tablets, G.G. told her appellant "raped" her. She described it in her forensic interview by saying G.G. said appellant put his "d-i-c-k" in her "butt." A part of A.H.'s forensic interview was admitted into evidence by agreement.

In early March 2014, G.G. also told J.S., a male friend a year older than she, about the "rape" in messages the two exchanged over a mobile application called "KIK." During their sexually-charged message-exchange, G.G. told J.S. she was not a virgin because appellant had "raped" her from the ages of "four to eleven." She later admitted she sneaked out of the house that night to meet J.S. after their exchange. In her forensic interview, A.H. told the interviewer G.G. told her that G.G. and J.S. "dry humped" that night.

The events that led immediately to appellant's prosecution began when G.G.'s mother saw, on G.G's tablet, the KIK conversation with J.S., including what G.G. said appellant had done to her. The mother testified that after reading the conversation, she called CPS, police, and a doctor. A nurse testified the mother told her she brought G.G. for an exam because she read that G.G. had been raped six years before. The exam revealed no signs of a hymen tear. When asked by the prosecution whether she had any concerns about the delayed outcry even though it was made in the "context of sexual behavior" with J.S., Waco detective Kimberly Clark testified she did not.

In her trial testimony, G.G. said "she had been raped" by appellant when she was five and six years old. She described two incidents. In the first, she was five years old. She said she and her brothers were playing a game. Appellant asked her to come into the bedroom. She complied and he closed the door, told her to take off her clothes, and had her lie face down on the bed. He put his "private part" inside her "butt." He threatened to beat her if she told anyone. In the second incident, she was six years old. She said she was getting toys out of a closet and appellant came in, took her clothes off, and had her lie face down on the bed. She saw appellant's "private part" and it was "sticking up." He then put his "private part" inside her "butt" as he had on the previous occasion.

Dr. Kerry Burkley, program director of Waco Children's Advocacy Center, testified to his forensic interview of G.G. after G.G.'s mother contacted police. Telling the jury about the incidents G.G. relayed to him, he described the events much as G.G. did in her testimony.

Dr. Ann Sims conducted an exam of G.G. in October 2014. Her written report of that exam was admitted into evidence. Her description of what G.G. told her about appellant's assaults was consistent with the descriptions provided by the other witnesses. The exam revealed only an anal fissure more consistent with constipation than with sexual abuse. Sims noted, however, it would be unlikely that any physical evidence would be found, given the lapse of time since the alleged abuse.

Appellant also testified. He acknowledged his previous criminal history, including his 2009 guilty plea for injury to G.G. He insisted he did not sexually assault G.G., that he had no sexual contact with her and that he never exposed himself to G.G.

*Fuentes v. State*, No. 07-17-00104-CR, 2019 WL 512236 at *1-2 (Tex. App.—Amarillo, Feb. 8, 2019, pet. ref'd). On February 8, 2019, Petitioner's conviction was affirmed on appeal, *id.*, and the Texas Court of Criminal Appeals (TCCA) refused Petitioner's Petition for Discretionary Review (PDR) on May 8, 2019. *Fuentes v. State*, No. PD-0248-19 (Tex. Crim. App. May 8, 2019). Petitioner did not file a petition for a writ of certiorari with the United States Supreme Court. (ECF No. 1 at 3.)

On June 15, 2020, Petitioner filed a pro se state habeas corpus application, listing the following grounds of relief:

1. Petitioner's trial counsel provided ineffective assistance of counsel during the guilt/innocence phase of the trial by failing to
   a. challenge a biased juror during voir dire;
   b. object when the State bolstered the complainant's credibility through other witness testimony;
   c. object to the presentation of cumulative evidence of Petitioner's prior assault conviction;
   d. employ the only viable defense available to Petitioner;
   e. object to the court reporter not reporting the entirety of the trial court proceedings; and
   f. make the State prove venue.

2. Petitioner's trial counsel provided ineffective assistance during the punishment phase of the trial by failing to
   a. object to an improper commitment question;

      b.  object to the State's argument regarding parole;
      c.  object to evidence not in the record;
      d.  obtain a mitigation expert; and
      e.  object to Count Two and Three as violating double jeopardy.

3. Petitioner's Fifth Amendment right against double jeopardy was violated by his punishments for Counts Two and Three.

(ECF No. 11-14 at 5-23.) On August 10, 2020, the state habeas court filed its Findings of Fact and Conclusions of Law and recommended denying Petitioner's application. (ECF No. 11-13 at 4-10.) On September 30, 2020, the TCCA denied Petitioner's application without written order on the findings of the trial court without hearing and on the court's independent review of the record. *Ex parte Fuentes*, No. WR-91,582-01 (Tex. Crim. App. Sept. 30, 2020.) (ECF No. 11-12.)

On October 23, 2020, Petitioner executed his federal habeas petition, listing the following grounds of relief:

1. Petitioner's trial counsel provided ineffective assistance of counsel during the guilt/innocence phase of the trial by failing to
      a.  challenge a biased juror during voir dire;
      b.  object when the State bolstered the complainant's credibility through other witness testimony;
      c.  object to the presentation of cumulative evidence of Petitioner's prior assault conviction;
      d.  employ the only viable defense available to Petitioner;
      e.  object to the court reporter not reporting chambers conferences; and
      f.  make the State prove venue.

2. Petitioner's trial counsel provided ineffective assistance during the punishment phase of the trial by failing to
      a.  object to an improper commitment question;
      b.  object to the State's argument regarding parole;
      c.  object to evidence not in the record;
      d.  obtain a mitigation expert; and
      e.  object to Count two and three as violating double jeopardy.

3. Petitioner's Fifth Amendment right against double jeopardy was violated by his punishments for Counts Two and Three;

4. The court of appeals erred in holding the trial court did not abuse its discretion by excluding the complainant's "KIK" conversation; and

5. The court of appeals erred in holding the trial court did not abuse its discretion by excluding the complainant's browser history of pornographic websites.

(ECF No. 1.) On March 7, 2022, Respondent filed his amended answer. (ECF No. 14.) Petitioner has not filed a reply.

## II. Standard of Review

Petitioner's federal habeas petition is governed by the heightened standard of review provided by the AEDPA. *See* 28 U.S.C. § 2254. Under § 2254(d), a petitioner may not obtain federal habeas corpus relief on any claim that was adjudicated on the merits in state court proceedings unless the adjudication of that claim either (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141 (2005). This demanding standard stops just short of imposing a complete bar on federal court re-litigation of claims already rejected in state proceedings. *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (citing *Felker v. Turpin*, 518 U.S. 651, 664 (1996)).

A federal habeas court's inquiry into unreasonableness always should be objective rather than subjective, with a focus on whether the state court's application of clearly established federal law was "objectively unreasonable" and not whether it was incorrect or erroneous. *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (citing *Williams v. Taylor*,

6

529 U.S. 362, 409 (2000)). Even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. *Richter*, 562 U.S. at 102. A petitioner must show that the state court's decision was objectively unreasonable, which is a "substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (citation omitted). As a result, to obtain federal habeas relief on a claim previously adjudicated on the merits in state court, Petitioner must show that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103; *see also Bobby v. Dixon*, 565 U.S. 23, 24 (2011). "'If this standard is difficult to meet—and it is—that is because it was meant to be.'" *Mejia v. Davis*, 906 F.3d 307, 314 (5th Cir. 2018) (quoting *Burt v. Titlow*, 571 U.S. 12, 20 (2013)).

### III. Discussion & Analysis

1. Ineffective Assistance of Counsel (claims 1-2)

In Petitioner's first and second claims for relief, he argues his trial counsel—Mr. Alan Bennett and Ms. Susan Kelly—provided ineffective assistance of counsel throughout the guilt/innocence and punishment phases of the trial. The Sixth Amendment to the United States Constitution guarantees citizens the assistance of counsel in defending against criminal prosecutions. U.S. CONST. amend VI. Sixth Amendment claims based on ineffective assistance of counsel are reviewed under the familiar two-prong test

established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner cannot establish a violation of his Sixth Amendment right to counsel unless he demonstrates (1) counsel's performance was deficient and (2) this deficiency prejudiced the petitioner's defense. *Id.* at 687-88, 690. The Supreme Court has emphasized that "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

When determining whether counsel performed deficiently, courts "must be highly deferential" to counsel's conduct and a petitioner must show that counsel's performance fell beyond the bounds of prevailing objective professional standards. *Strickland,* 466 U.S. at 687-89. Counsel is "'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Burt*, 571 U.S. at 22 (quoting *Strickland*, 466 U.S. at 690). To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Under this prong, the "likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693). A habeas petitioner has the burden of proving both prongs of the *Strickland* test. *Wong v. Belmontes*, 558 U.S. 15, 27 (2009).

Ineffective assistance of counsel claims are considered mixed questions of law and fact and are analyzed under the "unreasonable application" standard of 28 U.S.C. § 2254(d)(1). *Gregory v. Thaler*, 601 F.3d 347, 351 (5th Cir. 2010). When the state court has adjudicated the claims on the merits, a federal court must review a petitioner's claims

8

under the "'doubly deferential'" standards of both *Strickland* and § 2254(d). *Woods v. Etherton*, 578 U.S. 113, 117 (2016) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)). In such cases, the "pivotal question" is not "whether defense counsel's performance fell below *Strickland*'s standard," but whether "the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S at 101.

   a. *Voir Dire (claims 1a, 2a)*

Petitioner argues his trial counsel provided ineffective assistance during voir dire when counsel failed to challenge or peremptorily strike a biased juror, and when counsel failed to object to the prosecutor's improper commitment question. Specifically, Petitioner argues trial counsel was deficient when counsel failed to strike or challenge a juror who stated his wife had been sexually abused as a teenager and that it had affected their marriage. Petitioner also argues counsel was deficient by failing to object when the prosecutor asked the venire panel if they could consider the full range of sentencing and used the example "the defendant is 17 and the victim is 13."

Counsel[1] responded to this allegation in an affidavit filed before the state habeas court:

> Venireperson Barker stated during voir dire that his first wife had been sexually abused by her stepfather who was convicted for an unspecified offense. Barker stated to the prosecutor that he could be "fair and open-minded" for Fuentes's case because the [two] situations were not related. Barker also stated later that he has an in-law who is a registered sex offender, but he does not know what for. Barker stated to the prosecutor this would not affect him in this case. When asked by the prosecutor what his [two] primary goals in sentencing would be, Barker answered punishment (1) and rehabilitation (4).

---

[1] Although Mr. Bennett and Ms. Kelly filed individual affidavits, because their responses are identical, the Court will only reference Mr. Bennett's affidavit.

Under examination by defense counsel, Barker stated unequivocally that he could consider a minimum sentence.

Barker was not, in our opinion, challengeable for cause because he stated that he would be "fair and open-minded." I did not separately ask him if he could set his first wife's experience aside in deliberating in this case, but the response he gave the prosecutor suggested to us that he would also state that he could set that experience aside in his deliberations.

We chose not to exercise a peremptory challenge against Barker because he listed rehabilitation as an important sentencing aim, he stated that he would consider a minimum punishment, and there was a possibility that he might have some sympathy for a person accused of a sex crime because of his familial experiences (concededly, the opposite is also true).

The prosecutor asked the venire panel whether they could consider the entire range of punishment and particularly "the low end of the range" if hypothetically they were considering the case of a "very young defendant and a pretty old victim." This hypothetical arguably constituted an improper commitment question under *Cardenas* and *Standefer*. But with an only slight variation in how the question was phrased, it could become a proper question about whether each venire member could consider the full range of punishment. Ms. LaBorde is a skilled prosecutor and, had we objected and the objection been sustained, she could have easily rephrased her question to obtain the same information in a non-objectionable form. As a strategic matter, we chose not to object.

(ECF No. 11-13 at 14-15) (record citations omitted). The state habeas court considered

Petitioner's allegations and counsels' affidavits and made the following findings:

The Trial Court finds that Counsel's Affidavits, the record, and the Court's own recollection specifically refute the enumerated claims of ineffective assistance, to wit:

1) Failed to challenge a juror for cause or exercise a peremptory strike: Venireperson [Barker]'s voir dire responses reflected that he could be "fair and open-minded," and he enunciated nothing that would have made him challengeable for cause. Counsel's affidavits reflect that a peremptory strike was not exercised because [Barker] claimed a close relation to a registered sex offender, and considered rehabilitation as a primary goal in sentencing. Accordingly, counsel has enunciated a reasonable strategy behind the decision not to strike or challenge the panelist.

10

. . . .

7) Failed to object to improper commitment questions in voir dire: Counsel's affidavits, the record and the Court's own recollection reflect that trial counsel was not deficient in failing to object to what Applicant characterizes as "improper commitment questions" by the State during voir dire. As reflected in counsel's affidavits, such supposedly improper questions were at most inartfully phrased by the prosecutor. Had an objection been lodged, it is doubtful that it would have granted; more likely, the prosecutor would have been instructed to rephrase. Accordingly, Applicant has failed to demonstrate any prejudice.

(*Id.* at 6-7.)

A juror is biased if his "'views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Soria v. Johnson*, 207 F.3d 232, 242 (5th Cir. 2000) (quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)). Bias may be either actual or implied. To demonstrate actual bias, a petitioner must present "admission or factual proof" of bias. *United States v. Bishop*, 264 F.3d 535, 554 (5th Cir. 2001). Regarding implied bias, the Supreme Court has stated it could be shown in "'extreme situations'" such as "'a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction.'" *Solis v. Cockrell*, 342 F.3d 392, 395 (5th Cir. 2003) (quoting *Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring)).

During voir dire, Venireperson Barker told the prosecutor his first wife had been sexually abused by her stepfather and that the abuse affected her while they were married; he also affirmed he could be fair and open-minded about the case. (ECF No. 11-4 at 46-47.) The state habeas court found that nothing Barker said made him

challengeable for cause, and that counsels' decision not to use a peremptory strike was a reasonable trial strategy because Barker had a close relative who was a registered sex offender and because he stated rehabilitation was a primary goal in sentencing. Petitioner has failed to show that trial counsels' decision not to strike Barker was outside the bounds of prevailing professional standards thus the state habeas court's application of *Strickland* was not unreasonable. This claim is denied.

As it relates to the allegedly improper commitment question, the state habeas court—which was the same as the trial court—found it unlikely that any objection to the question would have been sustained. *See Mays v. Stephens*, 757 F.3d 211, 214 (5th Cir. 2014) (presumption of correctness afforded to state habeas court's determination of a factual issue is especially strong when state habeas court and trial court are one in the same); *see also Roberts v. Thaler*, 681 F.3d 597, 612 (5th Cir. 2012) ("the failure to lodge futile objections does not qualify as ineffective assistance") (quoting *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990)). Even assuming counsel performed deficiently by not objecting, Petitioner has failed to show prejudice: as trial counsel attested and the state habeas court found, even if counsel had objected and the objection had been sustained, the prosecutor would have simply rephrased the question to elicit the same response. *See Strickland*, 466 U.S. at 694 (to show prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.") As a result, the state habeas court's application of *Strickland* to this claim was not unreasonable, and it is denied.

b. *Complainant's credibility (claim 1b)*

Petitioner next argues his trial counsel provided ineffective assistance when they failed to object to the prosecution's use of witness testimony to bolster the complainant's credibility. Specifically, Petitioner points to the testimony from four different prosecution witnesses: Dr. Burkley, Detective Clark, the complainant's sister A.H., and psychologist William Carter. (ECF No. 1 at 7.) Trial counsel responded to these allegations as follows:

> The trial strategy selected by me and my co-counsel Susan Kelly focused primarily on: (1) discounting the complainant's credibility because she failed to report these allegations during prior interviews related to the injury-to-a-child/CPS investigations; and (2) discounting the complainant's credibility because she made up the allegation of sexual assault to bolster her sexual experience in the eyes of her boyfriend who questioned the extent of her sexual experience.
>
> . . . .
>
> When the defense attacks the credibility of a State's witness either through impeachment or even in opening statement, the State may rehabilitate the attacked witness with evidence of good character for truthfulness under Rule 608. *Michael v. State*, 235 S.W.3d 723, 726 (Tex. Crim. App. 2007). As stated above, the primary trial strategy was to attack the complainant's credibility. The defense did that with the very first witness, Dr. Burkley, and with most of the witnesses afterward. Thus, the State was entitled to call witnesses under Rule 608 to offer testimony about the complainant's good character for truthfulness.
>
> Additionally, case law prohibits a party from eliciting a "direct opinion" on the credibility of a child complainant--or any witness. *See Schutz v. State*, 957 S.W.2d 52, 59 (Tex. Crim. App. 1997).
>
> First, Dr. Burkley offered no opinion on the complainant's credibility. In anticipation of the defense's suggestion that the complainant was manipulating the situation to avoid getting in trouble for her own sexual misconduct, Dr. Burkley agreed that she would have to be "pretty high functioning" to accomplish such a feat. But Dr. Burkley offered no "direct opinion" (or any opinion) on the complainant's credibility, so there was nothing to object to.

Next, when the prosecutor asked Detective Clark on direct examination whether she believes every child, Clark responded that she believes every person who comes in her office unless or until she disproves what they have told her. She did not provide a "direct opinion" about the complainant's credibility. On cross examination, defense counsel Kelly essentially accused Clark of automatically believing the complainant without conducting a thorough investigation. Clark responded that she believed the complainant and found nothing in the investigation to disprove what the child said. This was part of a secondary defense strategy to undermine the validity of the investigation. Then, Clark repeated on redirect that she tended to believe a child until proven otherwise.

The prosecution did not ask Detective Clark for a direct opinion about the complainant's credibility. The defense elicited testimony on cross examination that arguably elicited her direct opinion but did so with a strategic purpose of undermining the validity of the investigation.

During the testimony of the complainant's younger sister A.H., the prosecutor elicited that A.H. did not initially believe the complainant's allegations. This was beneficial to the defense. A.H. then explained why and added, under the prosecutor's questioning, that she later believed the complainant. Both statements were probably inadmissible opinions on the complainant's credibility, but the first one favored the defense. And because that door had been opened, the State was allowed to offer the latter opinion as well. In our professional opinion, it was better strategically not to object to this testimony.

Finally, Dr. Lee Carter testified about characteristics of sexual assault victims. The prosecutor asked him about why a complainant may not describe what happened to her the same every time. Dr. Carter then provided a lengthy response highlighting several reasons the complainant's story may vary in different settings and why it could be concerning if she recited it precisely the same every time. He concluded, "So you just have to ask the question, is the variation too much for me to believe her at all." He then agreed that this was a question for the jury.

Dr. Carter provided no direct opinion on the complainant's credibility, so there was no reason to object to this testimony.

For each of these reasons, neither myself nor co-counsel objected to the complained of testimony.

(ECF No. 11-13 at 16-18) (record citations omitted). The state habeas court made the following findings of fact:

> 2) Failed to object to the prosecutors' questions eliciting witnesses' opinions on the victim's credibility: the record, the affidavits of counsel, and the Court's own recollection reflect that the prosecutor's questions did not elicit opinions on the victim's credibility. To the extent the record suggests that such opinions were elicited, counsel's affidavits reflect that strategic decisions were made not to object, because the examination Detective Clark reflected deficiency in the State's investigation. The changing testimony by A.H. as to whether or not she believed the victim, was not also not objected to as a function of reasonable trial strategy.

(*Id.* at 6.)

Trial counsel has broad discretion when it comes to deciding how best to proceed strategically. *See Ward v. Stephens*, 777 F.3d 250, 264 (5th Cir. 2015) (the Supreme Court has emphasized counsel has "wide latitude in deciding how best to represent a client"). This Court is mindful that "Strickland does not allow second guessing of trial strategy and must be applied with keen awareness that this is an after-the-fact inquiry." *Granados v. Quarterman*, 455 F.3d 529, 534 (5th Cir. 2006). In other words, simply because counsel's strategy was not successful does not mean counsel's performance was deficient. *Avila v. Quarterman*, 560 F.3d 299, 314 (5th Cir. 2009).

Here, counsel attested their trial strategy was to discredit the complainant's allegations by focusing on (1) her failure to report the allegations despite having multiple contacts with relevant authorities for many years, and (2) the context in which her allegations arose, i.e., the KIK messages with another boy. The state habeas court credited counsels' explanations as to why they did not object as the function of a reasonable trial strategy. Given the wide latitude afforded trial counsel in determining

how best to represent their client, Petitioner has failed to show that Mr. Bennett's and Ms. Kelly's performance fell below prevailing objective professional standards. Accordingly, the state habeas court's denial of this claim was not an unreasonable application of *Strickland* and it is denied.

c. *Non-viable defensive strategy (claims 1c, 1d)*

Petitioner next argues his counsel provided ineffective assistance when they failed to object to the prosecution's presentation of cumulative evidence of Petitioner's prior conviction of injury to a child against the complainant, and when they failed to present his only viable defense, which Petitioner argues is that "the complainant was afraid [Petitioner] would come back after he got out of prison and assault her or her mother." (ECF No. 1 at 7.) Trial counsel responded to these claims as follows:

> As stated in the introduction, a primary defensive strategy was to characterize the complainant's sexual accusations as recent fabrications because she was regularly interviewed by CPS caseworkers and other professionals shortly after the sexual offenses purportedly occurred yet never once suggested that Fuentes had engaged in any sexual misconduct toward her. Fuentes claims in Issue (3) that the defense failed to object to cumulative evidence of his prior conviction for injury to a child. He claims in Issue (4) that the defense failed to present a viable defense of fabrication. Despite Fuentes's claims to the contrary, the entire defensive strategy was built around the concept of fabrication.
>
> . . . .
>
> We allowed the 6 witnesses (Heath Mynar, Rachel Flores, Brian Polley, Veronica Terrell, Charles Levy, and Reginald Lewis) about whom Fuentes complains to be called so we could confirm that the complainant never made an outcry of sexual misconduct during the prior investigation. Officer Mynar testified on cross-examination that the complainant made no outcry of sexual abuse. CPS worker Rachel Flores testified on cross-examination that she monitored the complainant and her brothers in Fort Worth while they were placed with their grandmother. The children's visits with Fuentes were always appropriate. The children enjoyed the visits and never

16

displayed any negative emotional reactions to them. CPS worker Brian Polley testified on cross-examination that he built a rapport with the complainant, some children in CPS care make outcries of additional allegations while in CPS care, but the complainant did not. CPS investigative supervisor Veronica Terrell testified on cross-examination that caseworker Reginald Lewis would have been trained to screen the complainant not only for physical but also sexual abuse which was standard procedure. Charles Levy was the complainant's ad litem in the CPS case and testified that he would have spoken with her on several occasions and, if she made any outcry of further abuse, he would have made sure that outcry was addressed by CPS if they were already aware, or by his own reporting of the outcry. CPS investigator Reginald Lewis testified on cross-examination that his investigation required him to screen children for both physical and sexual abuse, the complainant had opportunities to make an outcry of sexual abuse in 2007, but she never did.

. . . .

The defense also challenged the complainant's credibility about the allegations with evidence that she fabricated the allegations because she made up the allegation of sexual assault to bolster her sexual experience in the eyes of her boyfriend who questioned the extent of her sexual experience.

In a Kik chat with a boyfriend, the complainant first claimed that Fuentes sexually assaulted her when the boyfriend questioned her sexual experience. A forensic analysis of her iPad revealed the full extent of the sex chat between her boyfriend and her and also disclosed an internet history of visiting pornography websites. The complainant did not make an outcry to an adult until her mother caught her sneaking out in the middle of the night for an escapade with the boyfriend and observed their Kik messages.

(ECF No. 11-13 at 18-21.) The state habeas court made the following findings:

3) Failed to object to cumulative evidence of Applicant's prior conviction for Injury to a Child; and 4) Failed to present a viable defense of fabrication: Counsel's affidavits, the record and the Court's own recollections reflect that a defense of fabrication was pursued, based in large part on Applicant's prior conviction for Injury to a Child and the theory that the victim fabricated the sexual abuse allegations "to get back at" Applicant for the earlier offense. Accordingly, counsel pursued a reasonable trial strategy by allowing the jury to know about the prior conviction for Injury to a Child.

17

(*Id.* at 6-7.)

As noted above, trial counsel has wide latitude in pursuing a defense strategy. *See Ward*, 777 F.3d at 264. Here, trial counsel intentionally used the testimony regarding Petitioner's prior conviction to show that the complainant failed to make an outcry despite having multiple opportunities to do so. Petitioner argues his only viable defensive strategy was to argue the complainant fabricated her allegations because she was worried he would assault her and her mother after he left prison. Counsel did present a fabrication defense, although it focused on the context of the complainant's outcry rather than any concern she might have felt regarding Petitioner's release from prison. Again, the Court "must be highly deferential" to counsels' conduct and trial strategy, *Strickland,* 466 U.S. at 687-89, and Petitioner has failed to show his trial counsel's performance was deficient. As a result, the state habeas court's application of *Strickland* was not unreasonable and these claims are denied.

d. *Chambers conferences (claim 1e)*

Petitioner next argues trial counsel provided ineffective assistance because they failed to object when the court reporter was not present at all of the chambers conferences. Petitioner argues that "recorded chambers conferences show that the issues dealt with the admissibility of evidence and questions, issues to be resolved on appeal." (ECF No. 1 at 7.) Trial counsel responded to this allegation as follows:

> Judge Johnson has a custom of conducting informal conferences with counsel for both parties from time to time during trials to discuss potential objections, admissibility questions, and other potentially contested matters. These informal conferences are often helpful in keeping a trial running smoothly and clarifying matters on which objections may be raised. Judge

Johnson never makes formal rulings in these proceedings although he occasionally shares his opinion on the matters being discussed.

If the judge ever indicates that he will rule adversely to my client in a matter, I ensure that the matter is placed on the record so formal objections or requests can be made and the trial court's ruling placed on the record. I am board certified in criminal appellate law and well-versed in the requirements for preserving error for appeal. I have never experienced an adverse ruling in an informal chamber conference that was not formally placed on the record and preserved for appeal. In fact, when Judge Johnson has indicated that he may rule adversely to my client, he usually asks that the court reporter make a record either in chambers or in the courtroom before proceeding. I did not raise any objection to any informal chamber conferences that we may have had in Fuentes's case because there was no need to.

(ECF No. 11-13 at 21-22.) The state habeas court made the following findings:

5) Failed to preserve a record of chambers conferences: Counsel's affidavits and the Court's own recollection reflect that off-the-record chambers conferences were held to facilitate the flow of the trial, and that no rulings of the Court were made in such conferences. The Court finds that counsel were not deficient in their performance for failing to preserve a record on any matters that were discussed off the record. Further, there is no showing of prejudice due to the fact that any chambers conferences were not recorded.

(*Id.* at 7.)

The state habeas court found that there were no rulings made in the unrecorded chambers conferences and thus trial counsel were not deficient in failing to object to them. *See Roberts*, 681 F.3d at 612 ("the failure to lodge futile objections does not qualify as ineffective assistance".) Further, Petitioner offers no clear and convincing evidence in support of his allegations that admissibility of evidence was addressed in chambers conferences. *See* 28 U.S.C. § 2254(e)(1) (state court factual determination presumed correct and Petitioner bears the burden of rebutting the presumption by clear and convincing evidence); *see also United States v. Demik*, 489 F.3d 644, 646 (5th Cir. 2007)

(conclusory allegations are insufficient to raise a cognizable claim of ineffective assistance of counsel). Accordingly, this claim is denied.

    e.   *Venue (claim 1f)*

Petitioner next argues his counsel were deficient when they failed to object to the State's failure to prove venue. Petitioner argues that the complainant did not remember where the sexual assaults occurred, and thus the assaults could have occurred in either McLennan County or Tarrant County. In response, trial counsel stated that the complainant lived with her mother, Petitioner, and her siblings in McLennan County until she was removed from her home by CPS. Afterwards, Petitioner did not have any unsupervised visits with the complainant. As a result, "the sexual abuse had to have happened in McLennan County, even if the complainant could not identify the particular residence where it occurred." (ECF No. 11-13 at 22.) The state habeas court concluded that "counsel's affidavits, the record and the Court's own recollection reflect that the evidence was sufficient to prove venue by a preponderance of the evidence." Again, Petitioner's conclusory allegations to the contrary are insufficient to rebut the state habeas court's factual findings. *Demik*, 489 F.3d at 646. This claim is denied.

    f.   *Sentencing arguments (claims 2b, 2c)*

Petitioner next argues that trial counsel provided ineffective assistance when they failed to object to the prosecutor's improper arguments during the close of punishment phase. Specifically, Petitioner points to the prosecutor's following statement:

> Let me tell you what parole would mean. You're going to the grocery store with your kids just picking up milk. Something quick. He's there walking down the same aisle. You want to drop off your child at daycare or just drive past a church, you see him walking down the street. That's him. You

> go to church and you sit across the aisle and you get bored and you look.
> There he is. That is what parole means. He is out there with every single
> one of us. He is out there with every single one of our kids. He is out there
> and able to reoffend. There's nothing to stop him.

(ECF No. 11-8 at 61-62.) Petitioner also argues trial counsel should have objected when the prosecutor told the jury "[The complainant] will think about him. When she has kids, she'll think about him. When she has sex, she'll think about him. Whenever she falls in love, she'll have to decide when she's going to tell that person what happened." (*Id.* at 71.) Petitioner argues the jury's sentencing decision was directly affected by these improper arguments that appealed to the jury's emotions but had no evidentiary support.

> Trial counsel responded as follows:
>
> We did not object to [the parole] argument because it appeared similar to
> other arguments found to be proper pleas for law enforcement and
> reasonable deductions from the evidence. It was not an improper specific
> request for the jurors to consider the parole law.
>
> The prosecutor also urged the jurors to consider how these sexual assaults
> might impact the complainant in the future with her children and husband.
>
> We did not object to this argument because it appeared to constitute a
> reasonable deduction from the evidence. To the extent the argument may
> have been objectionable, we would not have objected because doing so
> would have only called additional attention to the matter. Thus, for strategic
> reasons we chose not to object to argument that was, at worst, borderline
> objectionable.

(ECF No. 11-13 at 26.) The state habeas court found that any objection to the parole statement would likely not have been sustained, and that Petitioner had failed to demonstrate prejudice regarding the prosecutor's statements on the future impact of the abuse on the complainant. (*Id.* at 7-8.)

To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Again, the "likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693). The state habeas court found that trial counsels' failure to object to the state's closing argument was not deficient performance and did not prejudice Petitioner. Petitioner has not shown that there was a substantial likelihood of a different result had trial counsel objected to these arguments. Accordingly, the state habeas court's application of *Strickland* was not unreasonable, and these claims are denied.

g.   *Mitigation expert (claim 2d)*

Petitioner next argues his trial counsel provided ineffective assistance when they failed to obtain a mitigation expert for the punishment phase of his trial. He argues a mitigation expert was necessary to conduct a psychological assessment and to analyze the risk of recidivism for Petitioner and his suitability for sex offender treatment. Trial counsel responded that they had reviewed Petitioner's mental health history, but that it was limited and that, after he reported having "anger issues" and received a psychological evaluation with MHMR in 2013, he nonetheless did not participate in MHMR services. Counsel therefore concluded "as a strategic matter that there was no available mitigating evidence and it would not be beneficial to try and secure the services of a mitigation expert." (ECF No. 11-13 at 24-25.) The state habeas court found that trial counsels' affidavit showed "an adequate and conscientious investigation" in Petitioner's mental

health history, and that the information they found—that Petitioner had anger issues and had failed to participate in mental health services after his evaluation—"could have as easily been considered aggravating as mitigating" which supported their strategic decision not to present the evidence. (*Id.* at 8.)

*Strickland* requires counsel to undertake a reasonable investigation. 466 U.S. at 690-91; *Charles v. Stephens*, 736 F.3d 380, 389 (5th Cir. 2013). Counsel must, at minimum, interview potential witnesses and make an independent investigation of the facts and circumstances of the case. *Kately v. Cain*, 704 F.3d 356, 361 (5th Cir. 2013). In assessing the reasonableness of counsel's investigation, a heavy measure of deference is applied to counsel's judgments and is weighed in light of the defendant's own statements and actions. *Strickland*, 466 U.S. at 691. To prevail on an ineffective-assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate the witness was available to testify, delineate the content of the witness's proposed testimony, and show the testimony would have been favorable to the defense. *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).

Here, counsel conducted an investigation into Petitioner's mental health history and did not find any evidence they considered mitigating. Although Petitioner argues counsel should have hired a mitigation expert to perform a psychological evaluation and consider his risk for reoffending and eligibility of sex offender treatment, Petitioner does not identify any expert who was available to testify on Petitioner's behalf and what they would have testified to. Petitioner's allegations that such an expert existed are conclusory and cannot support a claim for ineffective assistance. *Demik*, 489 F.3d at 646.

Accordingly, the state habeas court's application of *Strickland* was not unreasonable and this claim is denied.

2. Double Jeopardy (claims 2e, 3)

Petitioner raises two claims regarding double jeopardy—one is a direct challenge to his conviction on Counts Two and Three as violating double jeopardy and the second is a claim that his trial counsel provided ineffective assistance when they failed to object to his convictions and punishments based on double jeopardy. Specifically, Petitioner argues his conviction for indecency with a child by exposure is subsumed by his conviction for aggravated sexual assault of a child because they are based on the same conduct.

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. CONST. amend V. The Double Jeopardy Clause of the Fifth Amendment "prohibits the [g]overnment from charging a single offense in several counts and is intended to prevent multiple punishments for the same act." *United States v. Kimbrough*, 69 F.3d 723, 729 (5th Cir. 1995). Convictions are multiplicitous where the defendant is charged with and convicted of violating two distinct statutes based on the same underlying conduct where one statute is a lesser-included offense of the other. *United States v. Woerner*, 709 F.3d 527, 539 (5th Cir. 2013) (citing *Blockburger v. United States*, 284 U.S. 299 (1932)). In *Blockburger*, the Supreme Court set forth the test to determine whether multiple prosecutions are barred by double jeopardy: "Unless each offense requires proof of an element that the other does not, a defendant may not be charged with both." *Id.* (citing *United States v. Nguyen*, 28 F.3d 477, 485 (5th Cir. 1994)).

24

In response to Petitioner's claim that his trial counsel provided ineffective assistance when they failed to challenge his convictions and punishments on Counts Two and Three as barred by double jeopardy, trial counsel stated:

> [T]he complainant testified that Fuentes pulled down his underwear and exposed his erect penis. Next, he penetrated her anus with his penis.
>
> The complainant testified to sequential but different acts. Either of these acts could have occurred in the absence of the other. Therefore, under *Maldonado* [*v. State*, 461 S.W.3d 144 (Tex. Crim. App. 2015)], the act of exposure was not subsumed by the act of penetration. *See Maldonado*, 461 S.W.3d at 149.
>
> For these reasons, a double jeopardy complaint would have been meritless.

(ECF No. 11-13 at 24.) (record citations omitted.) The state habeas court agreed, finding that "Counsel's explication of the relevant case law, and application of precedent to the facts adduced at trial establishes that Applicant was charged with distinct offenses wherein the Indecency by Exposure count was not subsumed by an Aggravated Sexual Assault count. Accordingly, relief on the basis of such a claim, either directly or as an ineffective assistance claim, is without merit." (*Id.* at 8-9.)

The trial record shows that the complainant testified that, during the second assault, Petitioner came into a room where she was getting toys out of the closet, and then he picked her up, put her on the bed so she was lying flat on her stomach, and then he removed all her clothes except her underwear. The complainant then testified as follows:

Q. Where were [the Petitioner's] clothes?

A. He had took them off, but he still, like, had his underwear on.

Q. Okay. Did he take his underwear off?

A. He only lowered them a little bit.

Q. Okay. Did you see anything when he did that?

A. I only seen his private area.

Q. Okay. What did that look like.

A. I don't know.

Q. Was it hanging down or sticking up?

A. It was sticking up.

Q. Okay. And what do you use that – what do boys use that private part for?

A. To use the rest room.

Q. Is that to go number one?

A. Yes, ma'am.

Q. Okay. And then what happened.

A. He put it inside my butt.

(ECF No. 11-5 at 271-72.) Dr. Kerry Burkley—the program director for the Children's Advocacy Center and the person who conducted the complainant's forensic interview—testified that the complainant described the second sexual assault to him as follows: "[Petitioner] came in, took off her clothes, he took off his clothes, and then — laid her down on the bed" and it was during this encounter that she saw Petitioner's penis. (ECF No. 11-5 at 184-85, 222).

Based on these two accounts, the Court concludes that fairminded jurists could disagree over whether Petitioner's exposure of his penis constituted the same underlying conduct as the subsequent sexual assault, as Petitioner argues, or a sequential but

different act, as the state habeas court found. As a result, both Petitioner's free-standing double jeopardy claim and his ineffective-assistance-of-counsel claim based on double jeopardy must be denied. *See Richter*, 562 U.S. at 101 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision.") (citation omitted).

3. Trial Court Error (Claims 4-5)

In his last two claims, Petitioner argues the appellate court erred when it concluded the trial court had not abused its discretion when it did not admit into evidence the complainant's KIK messages and the browser history from her tablet which included pornographic websites.

Petitioner did not raise these issues in his state habeas application but instead in his direct appeal, where his conviction was affirmed by the Texas Seventh Court of Appeals, and again in his PDR, which the TCCA refused. As a result, the Seventh Court of Appeals has the last reasoned state judgment regarding Petitioner's evidentiary claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) ("[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.")

Regarding these two claims, the state court of appeals reasoned as follows:

Appellant contends the trial court, in violation of the Sixth Amendment, unduly limited his right to cross-examine G.G. [the complainant] when it denied his request to admit the other sexually-oriented messages contained within the KIK conversation and denied his request to admit the browser history taken from G.G.'s tablet.

In response, the State correctly points out the court did not limit appellant's questioning of G.G. on cross examination. After a hearing outside the

presence of the jury regarding the KIK messages, the court placed no limitations on appellant's ability to question G.G. about her message exchange with J.S. Appellant cross examined G.G. regarding statements she made to [J.S.], including her statement indicating she was not a virgin because she had been "raped by her stepfather."

Appellant contends the print-out of the KIK message exchange was admissible to impeach G.G.'s testimony under rule of evidence 613. . . .

After review of the record, we find we need not evaluate the print-out's admissibility. Even if the trial court erred by excluding it, we find appellant was not harmed. . . .

In this case, appellant argued the print-out of the excluded KIK messages was relevant to his theory that G.G. fabricated her allegations against him to encourage J.S.'s sexual interest in her. But the exclusion of the print-out did not prevent appellant from presenting his desired defense. The jury heard G.G. acknowledge on cross examination that she told J.S. in their message exchange she was not a virgin, and that she made the accusations against appellant during that exchange. They also heard G.G. deny that J.S. was her boyfriend, deny that she was interested in his being her boyfriend, and deny that, during their exchange, they "talk[ed] about getting together to have sex." They heard her deny that she told J.S. that appellant had "raped" her because she wanted to meet J.S., but heard her admit that she did meet the boy. The jury also heard evidence that she and J.S. engaged, later that night, in contact of a sexual nature. That evidence came from the video of A.H.'s forensic interview with Dr. Burkley, in which A.H. said G.G. told her she and J.S. had "dry humped." This evidence allowed appellant to argue to the jury,

> We know from the questioning of [G.G.] that she was engaging in some message exchanges with [J.S.]. We know that she's said, I'm not a virgin. They were talking about sex. And now we know they snuck out that night and dry humped together. That was a sexual experience that she was participating in, and that is the context in which that outcry was made to [J.S.]. [A testifying expert] agreed that it could be important that the conversation and the context of it involved a child exploring her sexual actions or engaging in that kind of behavior.

Exclusion of the print-out of the KIK message exchange did not preclude appellant from presenting his defense that her statement accusing appellant of raping her was a fabrication meant to encourage J.S.'s sexual interest. Appellant repeatedly argued to the trial court that the print-out was

necessary to show the sexually-charged context of her message exchange with J.S., but the excluded print-out did not form the "vital core" of appellant's defensive theory of fabrication. Given the other evidence before the jury, we find instead the excluded print-out, . . . would only "incrementally" have furthered appellant's defensive theory. Consequently, any error in excluding it was not of constitutional dimension. . . .

With regard to the browser history from G.G.'s tablet, we find the trial court did not err by excluding the evidence. Appellant sought admission of the browser history to show G.G.'s motive for making the statements to J.S. and to show her sexual curiosity and knowledge. The proffered browser history did not reflect the content of the sites visited but only their titles. Some of the titles listed in the history suggested the sites would contain pornographic content. For the history to be relevant, the evidence must show G.G. was the person who accessed and viewed the pornography sites. TEX. R. EVID. 401 (defining "relevant evidence" as any evidence having any tendency to make the existence of a fact of consequence more or less probable than it would be without the evidence).

At the hearing outside the jury's presence, Detective James Owens, a Waco police computer forensic examiner, testified the data did not show who accessed the pornography on G.G.'s tablet. G.G. stated she did not access those sites and that she did not always have her tablet with her. Others in the house could have used it, she agreed. Detective Clark acknowledged that G.G.'s older brother had at some point logged into the browser under his user name and that other sites accessed on G.G.'s tablet included sites involving cars and weather.

Consequently, appellant failed to show the evidence of the tablet web browser history was relevant to an issue at trial. We cannot find the trial court abused its discretion in finding the web browser history inadmissible. For these reasons, we overrule appellant's second and third issues.

*Fuentes*, 2019 WL 512236, at *6-8.

The admissibility of evidence is governed by state law. "'[Federal courts] do not sit as a "super" state supreme court' in such a proceeding to review errors under state law." *Dickerson v. Guste*, 932 F.2d 1142, 1145 (5th Cir. 1991) (quoting *Martin v. Wainwright*, 428 F.2d 356, 357 (5th Cir. 1970)). Even if the trial court erred, the Supreme Court has held that "federal habeas corpus relief does not lie for errors of state law."

*Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). Accordingly, a federal habeas court will not grant relief based on a state court's erroneous evidentiary rulings unless those errors result in a "denial of fundamental fairness" under the Fourteenth Amendment's Due Process Clause. *Neal v. Cain*, 141 F.3d 207, 214 (5th Cir. 1998) (citing *Porter v. Estelle*, 709 F.2d 944, 957 (5th Cir. 1983)).

In his federal petition, Petitioner effectively restates his arguments before the state court of appeals that his constitutional rights were violated by the exclusion of this evidence because the KIK conversations show the complainant had a motive to fabricate her outcry and the browser history showed that the complainant had more sexual knowledge than was suggested by her and Dr. Burkley's testimony. However, as the state court of appeals' noted in their opinion, Petitioner's trial counsel was able to argue this theory to the jury, i.e. that the complainant was motived to fabricate the abuse to appear more sexually experienced. Petitioner insists he was harmed by the exclusion of this evidence but fails to show that the court of appeals' opinion was contrary to clearly established federal law or that it resulted in the denial of fundamental fairness under the due process clause. Accordingly, these claims are denied.

## IV. Certificate of Appealability

A petitioner may not appeal a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases, the district court must issue or deny a certificate of appealability (COA) when it enters a final order adverse to

the applicant. *See Miller-El v. Cockrell,* 537 U.S. 322, 335-36 (2003) (citing 28 U.S.C. § 2253(c)(1)).

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). In cases where a district court rejects a petitioner's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When a district court rejects a habeas petition on procedural grounds without reaching the constitutional claims, "a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

In this case, reasonable jurists could not debate the dismissal or denial of the Petitioner's § 2254 petition on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. *Miller-El*, 537 U.S. at 327 (citing *Slack*, 529 U.S. at 484). Accordingly, the Court will not issue a certificate of appealability.

It is therefore **ORDERED** that Petitioner's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (ECF No. 1) is **DENIED**; and

It is **FURTHER ORDERED** that no certificate of appealability shall issue.

**SIGNED** this 6th day of May, 2022.

_____
ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE